IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| PRECISION CALIBRATION AND | * | |
| TESTING CORPORATION, | * | |
|     Debtors | * | Case No.: 1-04-bk-04046MDF |
| | * | |
| FRANK BONITATI and IRENE ELWELL | * | |
| d/b/a BONEL INVESTMENT GROUP, and | * | |
| KELLY BEAUDIN STAPLETON, | * | |
| UNITED STATES TRUSTEE | * | |
|     Objectants | * | |
| | * | |
| v. | * | |
| | * | |
| PRECISION CALIBRATION AND | * | |
| TESTING CORPORATION, | * | |
|     Respondent | * | |

**OPINION**

Before me is the chapter 11 plan of reorganization of Precision Calibration and Testing Corporation ("Debtor") and the objections thereto filed by Frank Bonitati and Irene Elwell doing business as BonEl Investment Group ("BonEl") and the United States Trustee ("UST"). According to its Third Amended Disclosure Statement, Debtor is in the business of "calibration and testing of equipment to precise measurements." BonEl is Debtor's largest unsecured creditor having filed a proof of claim in the amount of $139,768.22.[1] Debtor lists BonEl's claim as liquidated, non-contingent and undisputed.

Debtor filed its chapter 11 petition on July 2, 2004 and has been operating as a debtor-in-possession. On February 27, 2007, Debtor filed its Third Amended Plan of Reorganization (the "Plan") which provides, *inter alia*, for the establishment of seven classes of claims and interests.

---

[1] BonEl's claim is listed at $106,000.00 in Debtor's schedule "F." Debtor has not filed an objection to the claim.

Only Classes V, VI and VII are relevant to the instant Opinion.[2] Class V consists of allowed unsecured claims not exceeding $249.99. Debtor proposes to pay 50% of the face value of these claims within ninety days of confirmation. Class VI, which includes BonEl's claim, comprises all other allowed unsecured claims. Debtor proposes to pay 10% of the face value of these claims within five years of the effective date of the Plan. Class VII consists of Debtor's equity holders, which are given a right of first refusal to "retain their stock in the Debtor upon payment to the Debtor . . . of $100.00 for each percent ownership retained, but shall receive no other distribution unless and until claims in all other Classes have been paid in full . . . ."

BonEl argues that the Plan cannot be confirmed because: (a) it classifies claims improperly; (b) it was proposed in bad faith; (c) the compensation of Debtor's principal is excessive; (d) all impaired classes of creditors who have not accepted the plan are not paid in full; (e) no impaired class has accepted the plan; and (f) the treatment of Class VII violates the absolute priority rule. The UST objects to the plan arguing that it is not feasible.[3] As I discuss below, BonEl's objections that the Plan classifies claims improperly, that no bona fide impaired class has accepted the Plan, and that the Plan violates the absolute priority rule will be sustained.

---

[2]Class I, which includes administrative claims, is to be paid in full within 180 days of the effective date of the Plan. Class II consists of the secured claim of Fulton Bank, which is to be paid in full "through the continued operation of Debtor's business." Class III consists of the secured and priority claims of the Internal Revenue Service and the Pennsylvania Department of Revenue. Claims in this class are to be paid in full within six years from the date of assessment with interest as determined by statute. Class IV consists of the claims of leaseholders for certain real and personal property which are to be paid in full according to the respective lease contracts.

[3]The UST also objected to the requirement in Plan that non-contingent, liquidated, undisputed claims listed in Debtor's schedules be required to file a proof of claim in order to receive distributions from the Plan in contravention of § 1111. At the hearing, Debtor agreed that this provision would be deleted from the Plan, therefore, I do not find it necessary to address the issue in this Opinion.

The objection to the feasibility of the Plan lodged by the UST also will be sustained. All other objections of BonEl will be denied.[4]

**Discussion**

The requirements for confirmation of a chapter 11 plan are specified in 11 U.S.C. § 1129. The plan proponent bears the burden of establishing the plan's compliance with each of the requirements of the section. *In re Lernout & Hauspie Speech Products, N.V.*, 301 B.R. 651, 656 (Bankr. D. Del. 2003); *In re Genesis Health Ventures, Inc.,* 266 B.R. 591, 598-99 (Bankr. D. Del. 2001). Because Debtor is attempting to confirm the Plan through the cram down provisions of § 1129(b), the Plan must comply with all of the provisions of § 1129(a) except paragraph (8). As discussed below, the Plan fails to meet the requirements of § 1129(a)(1) because it does not comply with all of the relevant provisions of title 11, namely § 1122(b). The Plan also fails to meet the requirements of § 1129(a)(10) because Class V, which voted in favor of the Plan, is not a bona fide class. The requirements of § 1129(a)(11) are not met because the Plan is not feasible. Finally, the Plan fails to meet the requirements of § 1129(b) that when all impaired classes do not accept a plan, it must not discriminate unfairly and must be fair and equitable. Debtor's Plan fails to meet this requirement because the proposed treatment of the equity holders violates the absolute priority rule.

---

[4] I have jurisdiction to hear this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A), (L) and (O). This Opinion constitutes the findings of fact and conclusions of law required to be made pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7052, which is made applicable to contested matters by FRBP 9014.

3

a. *Classification of claims*

Section 1122(b) provides that "a plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." 11 U.S.C. § 1122(b). In the parlance of chapter 11, § 1122(b) authorizes the classification of claims for administrative convenience. Class V is a "convenience class," which typically includes relatively minor claims scheduled to be paid soon after confirmation thereby reducing administrative burdens on the reorganized debtor. BonEl asserts that the creation of Class V does not meet the requirements of § 1122(b) because the class was created not for administrative convenience, but to artificially divide similar claims in order to create an impaired class of creditors likely to vote in favor of the Plan.[5]

I find merit in BonEl's argument. The statute authorizes a debtor to place similar claims in separate classes, but this right is not without restriction. The creation of separate classes is appropriate when one group of creditors has different interests and expectations from another group of creditors. *Troy Savings Bank v. Travelers Motor Inn, Inc.*, 215 B.R. 485 (N.D.N.Y. 1997). But the Code does not "allow a [plan proponent] complete freedom to place substantially similar claims in separate classes." *John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Associates (In re Route 37 Business Park Associates)*, 987 F.2d 154, 158 (3d Cir.1993). As the Circuit Court observed in *John Hancock*, if a plan proponent is afforded unfettered discretion to divide substantially similar claims into separate classes, it could

---

[5]Impaired claims are those modified in some way by a plan. *Lydick v. Cross*, 197 B.R. 321 (D. Neb. 1995). Under 11 U.S.C. § 1129(a)(10), at least one impaired class of claims must accept a plan in order for the plan to be confirmable. Class V did, in fact, vote for confirmation of the plan, while Class VI did not.

4

manipulate plan approval through the creation of arbitrary divisions. *Id.* Indiscriminate classification of claims would effectively eliminate the requirement of § 1129(a)(10) that at least one consenting class of impaired claimants vote to accept the plan. Accordingly, a plan proponent seeking confirmation through a cram down must classify claims so that each class represents "a voting interest that is sufficiently distinct and weighty to merit a separate voice in determining whether the proposed reorganization should proceed." *Id.* at 159. *See also, Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1279 (5th Cir.1991) ("[T]hou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."); *In re Snyders Drug Stores, Inc.* 307 B.R. 889, 893 (Bankr. N.D. Ohio 2004) ("A debtor may not classify similar claims differently solely to gerrymander an affirmative vote on a plan.")

BonEl challenges the creation of Class V, the convenience class. "Generally, an administrative convenience class is one where the claims are so small in amount and large in number as to make dealing with them burdensome." *In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 898 (9th Cir. BAP 1994). The Code specifically authorizes the creation of a convenience claims class, but the separation between convenience claims and other general unsecured claim must be bona fide. When the number of claimants in the convenience class is small, administrative costs savings becomes less significant to reorganization. Therefore, the creation of a small convenience class is subject to greater scrutiny.

5

According to Debtor's schedules, there are twenty claims classified as convenience claims among a total of fifty-seven general, unsecured claims.[6] Class V claimants are not being paid in full on the effective date of the Plan although the total amount of the claims in the class is small. Debtor proposes to pay this class 50% of their claims in ninety days. Both the small number of affected claims and their treatment suggest that Class V was not created for convenience in administration. If the convenience claims were paid in full, Debtor would not have an impaired class to meet the requirements of § 1129(a)(10). On the other hand, it is unclear how administrative efficiency is furthered by segregating claims under $250.00 from those exceeding that amount. Fifty-seven claims is not an unwieldy or burdensome number of creditors to administer as one class. Therefore, I conclude that Debtor's creation of Class V does not comport with the requirements of § 1122(b) and, consequently, does not meet the requirements of § 1129(a)(1). If creation of Class V was not proper, then the Court also must find that Debtor has failed to meet the requirements of § 1129(a)(10).[7] For these reasons alone, Debtor's Plan may not be confirmed.

---

[6] The convenience claimants include such entities as Earthlink, Inc. of Pasadena, CA ($147.00), Interstate Publishers of Fort Lee, N.J. ($200.00), Masterman's of Auburn, MA ($17.00), RecOil, Inc. of York, PA ($71.00), United Parcel Service, ($40.00), Ward Trucking of Altoona, PA ($230.00), and Weaver Classic Eyewear of York, PA ($207.00). Creditors missing the convenience class cut by only a small margin include Staples Office Supplies of Des Moines, IA ($265.00), Miller Electric Co. of Mount Wolf, PA ($317.00) and York Waste Disposal, Inc. ($262.00). The claims listed on Debtor's schedules that were $249.00 or less, and thus would be included in Class V total $2,210.00.

[7] Debtor does not rely solely on the argument that Class V was created for convenience. It asserts that it "needs" the future services of this class of creditors to continue its business. However, it is not obvious to the Court why this would be true, and Debtor advanced no argument that claimants in Class V provide goods or services that are unique or critical to Debtor's operations.

b.  *Good Faith*[8]

Although I find that classification scheme in Debtor's Plan is inappropriate, I do not find that the Plan was not filed in good faith. Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." "[T]here is no hard and fast definition of good faith, but the Court must look at the totality of the circumstances in any given case." *In re Global Water Technologies, Inc.* 311 B.R. 896, 902 -903 (Bankr. D. Colo. 2004). "To determine good faith the court looks to the debtor's plan and determines, in light of the particular facts and circumstances, whether the plan will fairly achieve a result consistent with the Bankruptcy Code." *Id. citing In re Valley View Shopping Center, L.P.*, 260 B.R. 10, 27-28 (Bankr. D. Kan. 2001); *See also In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir.1985)). As discussed above, the Plan will not achieve a result consistent with the Bankruptcy Code for several reasons.

"[A]ttempts to manufacture artificially, or to gerrymander, classes to obtain an accepting impaired non-insider class raise questions of good faith." *In re Combustion Engineering, Inc.* 391 F.3d 190, 247 (3rd Cir. 2004). "[T]he act of impairment in an attempt to gerrymander a voting class of creditors is indicative of bad faith." *In re Hotel Associates of Tucson,* 165 B.R. 470, 475-76 (9th Cir. BAP 1994); *In re Dow Corning Corp.,* 255 B.R. 445, 496 (E.D. Mich. 2000); *In re Woolley's Parkway Center, Inc.,* 147 B.R. 996, 1003 (M.D. Fla. 1992); *In re*

---

[8]This Opinion does not address at length BonEl's other objections to the Plan that were not sustained. Several objections were alternatives to other objections. Two significant issues raised by BonEl were the good faith of Debtor's plan as required in § 1129(a)(3) and the disclosure of insider compensation as required by § 1129(a)(5). The Court finds that the disclosure of compensation was adequate and that the amounts paid to Debtor's principal were not unreasonable. Further discussion of this issue is not warranted. The issue of good faith, however, is closely related to the finding that the classification of claims was improper. Therefore, the Court finds that it is appropriate to provide a more extensive explanation of this issue even though the Court did not find bad faith.

7

*Meadow Glen, Ltd.*, 87 B.R. 421, 427 (W.D. Tex. 1988). As discussed above, I have found that Debtor gerrymandered the classification of claims to manipulate voting, and that in doing so it failed to comply with 11 U.S.C. § 1122(b). However, neither objectant provided me with further evidence on the issue of bad faith. I am unable to find that the Plan was filed in bad faith solely on the basis of gerrymandering when the cases so clearly call for an examination of the totality of the circumstances.

    *c.*    *Absolute Priority Rule*

BonEl also asserts that the treatment afforded to a junior class of claims, namely Debtor's equity holders, violates the provisions of § 1129(b). Under the so-called absolute priority rule, an objecting class must be paid in full before any junior class receives anything on account of their claims. 11 U.S.C. § 1129(b)(2)(B)(ii).[9] *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202, 108 S. Ct. 963, 966 (1988).

Notwithstanding the rule, some courts have recognized what is known as the "new value" exception or corollary to the rule. Under the new value exception, a majority of courts have held that a junior class that contributes new value in the form of money or money's worth that is

---

[9]The absolute priority rule defines the treatment that must be afforded to claims if all claims are not fully compensated and provides as follows:

> [T]he plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

11 U.S.C. § 1129(b)(2)(B).

8

reasonably equivalent to the value of the property retained and is necessary for reorganization is deemed to have met the absolute priority rule. *Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 442, 119 S. Ct. 1411, 1416 (1999). Other courts also have required that the contributions be "up front" and substantial. *See In re Snyder*, 967 F.2d 1126, 1131 (7th Cir. 1992); *In re Haskell Dawes Inc.*, 199 B.R. 867, 872 (Bankr. E.D. Pa. 1996).

In the instant case, BonEl asserts that the Plan violates the absolute priority rule because the new value being offered by Debtor's principal, who also is a shareholder, is not substantial and because no evidence was provided that the contribution will be made "up front" or that it is necessary to the reorganization. Although BonEl's objections are well founded, they are premature. In *North LaSalle, supra*, the Supreme Court declined to decide whether the new value exception to the absolute priority rule, which was judicially determined before the enactment of the Bankruptcy Code of 1978, continued to exist after the enactment of § 1129(b)(2)(B)(ii). If the rule does exist, however, the Supreme Court held that there must be some way to test the value of the proposed contribution against the market. *North LaSalle*, 526 U.S. at 457, 119 S.Ct. at 1423.

> Whether a market test would require an opportunity to offer competing plans or would be satisfied by a right to bid for the same interest sought by old equity is a question we do not decide here. It is enough to say, assuming a new value corollary, that plans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii).

*Id.* at 458, 119 S.Ct. at 1424.

9

In the instant case, the Plan does not provide any means to test the value of the proposed contributions against the market. Instead, the Plan fixes a value for Debtor's equity ($100.00 per share) and then gives current shareholders a right of first refusal to purchase that equity. Creditors, who may be willing to pay more that $100.00 per share for Debtor's equity, may only purchase shares if current equity holders do not acquire all of the shares being offered in the reorganized Debtor. Thus, the Plan violates the absolute priority rule and cannot be confirmed.

*d. Feasibility of the Plan*

A plan is "feasible" if "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . ." 11 U.S.C. § 1129(b)(11). The Code anticipates that a disclosure statement and plan will make certain projections regarding a debtor's financial future, and those projections must be reasonable and not based upon unsupported assumptions. The proponent of a plan must show that the plan "offers at least a reasonable prospect of success and . . . is workable." *In re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr. D. N.J. 1980); *In re Haas*, 162 F.3d 1087, 1090 (11th Cir.1998). "A showing of a reasonable assurance of success, not a guarantee of success, is required." *In re Chapin Revenue Cycle Management, LLC*, 343 B.R. 722, 725 (Bankr. M.D. Fla. 2006) (citing *In re New Midland Plaza Assocs.*, 247 B.R. 877, 885 (Bankr. S.D. Fla. 2000); *In re Patrician St. Joseph Partners L.P.*, 169 B.R. 669, 674 (D. Ariz. 1994). When assessing the feasibility of a plan that provides for funding through a debtor's continued operations, it is critical to determine whether the debtor can generate sufficient income to fund and maintain both current operations and its obligations under the plan. *In re Trevarrow Lanes, Inc.*, 183 B.R. 475, 482 (Bankr. E.D. Mich. 1995). A plan proponent must show that projections of future income

Case 1:04-bk-04046-MDF    Doc 445    Filed 11/09/07    Entered 11/16/07 09:34:01    Desc
Main Document    Page 10 of 13

and expenses are derived from realistic and well-founded assumptions and that the debtor has the ability to make the proposed payments. *In re Crosscreek Apartments, Ltd.,* 213 B.R. 521, 539 (Bankr. E.D. Tenn. 1997).

In its objection, the UST challenged the feasibility of the Plan on four grounds. The UST argues that the Plan is not feasible because Debtor's monthly projections of income through February 2008 anticipate that sales will double, but that expenses will increase only about 9%. The UST also notes that Debtor's financial projections fail to include additional expenditures that are required under the terms of the Plan, such as payments of $5,000.00 per month on priority tax claims. In addition, the UST asserts that the Plan is not feasible because Debtor's financial projections extend only through February 2008. The period covered by these projections is too short to provide unsecured creditors in Class VI, who will not be paid until five years after confirmation, with sufficient information to demonstrate that adequate future funding will be available to pay claims. Finally, the UST asserts that the Plan is not feasible because it makes illusory promises of potential "extra" payments for Classes V and VI. The UST argues that this representation is groundless because it is calculated as a percentage of projected monthly income, and Debtor has made no projections for the relevant period.[10] Each of these objections have merit.

Debtor's principal, Frank Kelkis ("Kelkis"), testified at the hearing on confirmation that Debtor's income projections far exceed its expense projections because Debtor's work is labor-intensive and so its profits are not primarily a function of the cost of raw materials versus the

---

[10] At the hearing, Debtor agreed to delete the extra payments provision from its plan. Accordingly, I need not address the feasibility of a plan stripped of this provision going forward.

11

selling prices of its products. He further testified that Debtor's expense projections are reasonable because Debtor lost two employees whose salaries were relatively high and replaced them with new employees whose salaries are relatively low. Thus, according to Kelkis, even without a substantial increase in the number of work contracts going forward, Debtor's profit margin on the work that it performs will increase.

Kelkis' predictions of future profitability were rosy, but insufficient evidence was offered to support these projections. Debtor's projections of future income and expenses lacked support from empirical data to support the generous projections on which the Plan is based. Debtor's actual sales figures for March 2006 to February 2007 report $558,464.00 in sales, while it projects sales of $825,704.00 for the period between March 2007 and February 2008 – an increase of 47.9%. Neither Debtor's disclosure statement nor Kelkis' testimony at the hearing provided any information to support this prodigious increase, either by identifying new clients or contracts or through a description of sales promotions/campaigns that Debtor intends to undertake. Consequently, I cannot find that Debtor's projections for its sales are based on "realistic and reasonable assumptions" that will enable it to make the proposed payments. *See Crosscreek Apts., supra.*

Similarly, Debtor's projections for its costs of goods sold are not supported by the record. Debtor projects costs of $562,223.00 for the Plan period as compared to historical costs of $511,331.00 for the same period. The difference between historical and projected costs represents an increase of less than 10%. Without specific information regarding past and current salaries and linkages between costs and sales, I cannot find that Debtor's recent replacement of

12

two highly-paid employees with two less-experienced ones provides a reasonable basis for concluding that Debtor's sales volume will increase dramatically while its costs will not.

Having concluded that Debtor has failed to demonstrate how its futures sales and income projections are reasonable and achievable, I am unable to conclude that Debtor will be able to make the proposed plan payments going forward.[11] Accordingly, if the instant plan were to be confirmed, it would likely result in the liquidation of the Debtor or the filing of a new chapter 11 petition. Therefore, the Plan is not feasible, and the UST's objection is sustained.

For the reasons discussed above, the objections of BonEl and the UST to Debtor's Third Amended Plan are sustained. An appropriate order follows.

By the Court,

*Mary D. France*
Bankruptcy Judge

Date: November 9, 2007

*This document is electronically signed and filed on the same date.*

---

[11]The Court specifically asked Kelkis the amount of income that would be required each month to fund payments under the Plan, but he was unable to provide that information.

13